# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 26 2016, 8:52 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly S. Lytle
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| C.N. and G.N., <br> *Appellant-Defendant,* <br><br> v. <br><br> Indiana Department of Child Services, <br> *Appellee-Plaintiff.* | October 26, 2016 <br><br> Court of Appeals Case No. 27A04-1602-JT-438 <br><br> Appeal from the Grant Superior Court <br><br> The Honorable Dana J. Kenworthy, Judge <br><br> Trial Court Cause No. 27D02-1504-JT-10 |

**Altice, Judge.**

## Case Summary

C.N. (Mother) and G.N. (Father) (collectively, Parents) appeal the involuntary termination of their parental rights to D.N. (Child). Parents challenge the sufficiency of the evidence supporting the termination of their rights.

We affirm.

## Facts & Procedural History

This family first came to the attention of the Department of Child Services (DCS) in 2009, when Mother's daughter from a prior relationship, H.M. (Sister), was adjudicated a Child in Need of Services (CHINS) due to parental neglect.[1] That CHINS case was closed in November 2010 and resulted in reunification.

Meanwhile, Child was born in October 2010. On July 5, 2012, DCS removed Child from Parents' care and filed a petition alleging that Child was a CHINS after Child was treated at a local hospital for a broken femur and Parents were unable to provide a plausible explanation as to how the injury occurred. Father was subsequently charged with class B felony battery resulting in serious bodily injury for causing Child's injury, and he ultimately pled guilty and was sentenced to six years, with one year executed and the remainder suspended.

[1] Sister is not a subject of this appeal. Accordingly, we discuss the proceedings involving Sister only to the extent they are relevant to the termination of Parents' rights to Child.

On August 2, 2012, while the CHINS petition remained pending, Child was returned to Mother's care on the conditions that Father was to have no contact with Child and Mother was to comply with a safety plan. Parents both admitted that Child was a CHINS, and he was adjudicated as such on August 31, 2012. On September 27, 2012, the trial court held a dispositional hearing and issued its dispositional decree ordering Parents to participate in services.

On May 1, 2013, Sister was removed from Parents' home due to allegations of child abuse and neglect, and she was subsequently adjudicated a CHINS. On May 9, 2013, just days after Sister's removal, Child was also removed and placed in foster care after a DCS caseworker discovered Father at Mother's home while Child was present, in violation of the CHINS court's orders. Neither Child nor Sister has been returned to Parents' care.

At a periodic case review on August 22, 2013, the CHINS court found that Parents were in compliance with Child's case plan, but had not enhanced their ability to fulfill their parental obligations.[2] Accordingly, Child was continued in foster care. At a permanency hearing on January 30, 2014, the CHINS court found that Parents were no longer consistently complying with court-ordered

---

[2] We have not been provided with transcripts of the hearings in the underlying CHINS cases, and although the CHINS court's orders were submitted into evidence, they contain few factual details. It is therefore difficult for us to elaborate on which services Parents were or were not participating in at the time each specific CHINS order was entered. Instead of attempting to do so, we will summarize the evidence presented at the TPR hearing below.

services. At that time, the CHINS court approved a permanency plan of termination of parental rights and adoption.

[8] On April 24, 2014, however, the CHINS court found that Parents were again compliant with Child's case plan and had enhanced their ability to fulfill parental obligations. Child was continued in foster care, but the CHINS court authorized increased supervised visits in Parents' home. Approximately one month later, the CHINS court changed the permanency plan back to reunification.

[9] Unfortunately, the improvement was short-lived. On September 25, 2014, following a periodic case review, the CHINS court found that Parents had not complied with Child's case plan, cooperated with DCS, or enhanced their ability to fulfill parental obligations, and that although Parents had visited with Child, they had not done so consistently. By the same order, the CHINS court restricted Parents' visitation with Child to one supervised visit per month and changed the permanency plan to termination of parental rights.

[10] At a February 26, 2015 periodic case review, the CHINS court again found that Parents had not complied with Child's case plan and had not enhanced their ability to fulfill their parental obligations. At a May 19, 2015 permanency hearing, the court found that Parents had not obtained suitable housing and their participation in court-ordered services had been minimal.

[11] DCS filed its termination petition on April 6, 2015.[3] A fact-finding hearing was held on July 23, August 13, September 15, and October 7, 2015, at which DCS presented evidence that Parents had not fully participated in the court-ordered services and had benefitted only marginally, if at all, from the services in which they did engage. Specifically, the CHINS court had ordered Parents to participate in home-based case management and therapy. For the five months preceding the termination hearing, Parents worked with home-based case manager Tina Caines. Caines testified that Parents refused to work on creating a budget and had not met their goal of maintaining stable housing. Additionally, Parents told Caines that they were unable to afford food and they had to use a food bank as recently as one month before the termination hearing. According to Caines, Parents were cooperative to the extent that they would attend sessions with her; however, they did not complete the tasks required by DCS and have indicated that they do not need help and can handle things themselves.

[12] Parents were also referred to home-based therapist Wendy King-Green in December 2014. King-Green was assigned to conduct therapy with Parents as well as therapeutic supervised visitation. King-Green testified that Parents regularly attended the visits and that Mother interacted well with Child, but that Father did not interact with Child, except during the last visit King-Green

---

[3] DCS also filed a petition to terminate Mother's rights to Sister. On the third day of the fact-finding hearing, Mother's counsel indicated that Mother wished to sign a consent to the voluntary termination of her rights to Sister. It is unclear from the record whether she ever did so.

supervised prior to the termination hearing. Parents did not participate in therapy for several months. They first started showing up for therapy in April 2015—after the termination petition was filed. Even then, Parents said they had no problems and did not need to work on anything. King-Green testified that Parents did not begin working on their issues until just a few weeks before the termination hearing.

[13] Parents were also referred to therapist Taylor Stephens for individual and couples counseling. Stephens worked with Parents from November 2013 until June 2014, when services were stopped due to a conflict between DCS and Stephens. Parents' goals included family reunification, working on coping skills, improving communication, and decreasing conflict. Stephens testified that Parents were unsuccessful in meeting these goals and had only benefitted marginally from counseling.

[14] The CHINS court also ordered Father to complete the Fatherhood Engagement Program (FEP). Father began services with FEP case manager Andy Lykens in July 2013. Lykens provided counseling for Father as well as supervised visits. Although Parents consistently attended visits, Father did not interact much with Child. Father showed up for only approximately half of his counseling sessions with Lykens. Father did not successfully complete FEP, and services were discontinued in August 2014 after Father indicated at a Child and Family Team Meeting (CFTM) that he no longer wanted to work with Lykens.

[15] Parents were also ordered to complete parenting assessments and follow all recommendations made as a result thereof, but they failed to do so. When Therapist Jeanette Hoeksema went to Parents' home to conduct the assessments, Parents denied her access to most of the home and asked her to limit the information she shared with DCS. Hoeksema conducted the interview portion of the assessment, and before leaving, informed Parents that the next phase of the assessment would be an observation of Parents with Child. Hoeksema testified that she told Parents to call her and set up a time for her to observe a visit, but Parents did not follow through. As a result, Hoeksema was unable to conduct a complete parenting assessment.

[16] DCS also presented evidence that Parents had exhibited hostile and aggressive behavior toward service providers and other individuals. Parents were asked to leave a July 22, 2014 CFTM after they began cursing and screaming at service providers. They left, but when the CFTM ended, they followed Lykens in his car, blaring their horn and attempting to run him off the road and into oncoming traffic. On several occasions, Parents followed Child's foster father in his vehicle after visits ended. As a result, the foster father stopped transporting Child to visits. On another occasion, when Lykens was conducting a supervised visit at Parents' home, the front door was open and Parents saw a neighbor walk by. Despite Child's presence, Parents wanted to go outside to confront the neighbor. Lykens told Parents that he would end the visit if they did so. They were argumentative, but they ultimately complied with Lykens's request to close the door and resume the visit. On other

occasions, Parents threatened to kick Lykens out of their home and said he "better stop trying to interfere with them." *Transcript* at 163.

[17] Moreover, evidence was presented that, despite having a steady income, Parents had been unable to maintain stable housing. Specifically, Mother receives $659 per month in disability income and occasionally makes additional money by working through a temp agency. Five months before the termination hearing, Father obtained full-time temporary employment, from which he earned $290 per week in take-home pay. Nevertheless, during those same five months, Parents had lived in four separate residences—including a shelter, a motel, and with Mother's mother. By the first day of the fact-finding hearing, Parents were living in an apartment, and although they had lived there for only approximately three months, eviction proceedings had already been filed against them. By the third day of the hearing, Parents had left their apartment and were again residing in a motel. Evidence was also presented that at various points earlier in the CHINS proceedings, Parents had been evicted from another apartment and had lived in a car and a storage unit.

[18] At the conclusion of the evidence, the trial court took the matter under advisement. On January 29, 2016, the trial court issued its order terminating Parents' parental rights. This appeal ensued.

## Discussion & Decision

[19] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.,* 804 N.E.2d 258,

265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N .E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[20] The trial court entered findings in its order terminating Parents' parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[21] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those

of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[22] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[23] On appeal, Parents argue that the evidence is insufficient to support the involuntary termination of their parental rights. Parents first challenge the trial

court's findings as to subsection (b)(2)(B)(i) and (ii). We note that DCS was required to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Here, the trial court found that DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in Child's removal or continued placement outside Parents' care will not be remedied and that the continuation of the parent-child relationship poses a threat to Child's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i)—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in Child's removal or continued placement outside Parents' care will not be remedied.

[24] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home will be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a

substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). In doing so, the court may consider the parent's history of neglect and response to services offered through DCS. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210.

[25] Additionally, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.*

[26] On appeal, Parents focus solely on whether the conditions leading to Child's initial removal on July 5, 2012, and his second removal on May 9, 2013, have been remedied. However, the language of Indiana's termination statute makes it clear that it is not only the basis for the Child's removal that may be considered, but also the reasons for the Child's continued placement outside of

the home.  *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Although Father's physical abuse of Child and Mother's violation of court orders prohibiting her from allowing Father to have contact with Child formed the basis for Child's removal from the home, Child's continued placement outside the home was based on Parents' failure to maintain stable housing and their failure to consistently participate in and benefit from services to address their parenting problems.[4]

[27] Having identified the conditions resulting in Child's removal and continued placement outside the home, we proceed to the second step of the analysis— determining whether there is a reasonable probability that those conditions will not be remedied.  As set forth above, DCS presented significant evidence of Parents' persistent and ongoing housing instability despite having a steady income.  DCS also presented extensive evidence establishing that Parents had not consistently participated in reunification services and had not demonstrated

---

[4] Parents devote a significant portion of their argument on the issue of whether the conditions resulting in Child's removal and continued placement outside the home will be remedied to the question of whether there was, in fact, a court order in place on May 9, 2013 that prohibited Mother from allowing Father to have contact with Child.  According to Parents, the "relevant portion" of the parental participation order required Mother to "abide by the terms of any no-contact order and/or protective order".  *Appellants' Brief* at 18-19. Parents correctly note that the no-contact order entered in Father's criminal case was dismissed prior to May 9, 2013, and argue that as a result, no court order was violated.  We find this argument disingenuous. Parents ignore other relevant language from the parental participation order providing that "[Mother] shall not permit [Father] to have any access to or communication with her and [Child]".  *Exhibit Volume* at 25. They also ignore the language of the CHINS court's August 9, 2012 order, which provided that Child's placement in Mother's care was conditioned upon Mother's compliance with a safety plan implemented by DCS and that "[s]hould Father be released from jail, Father shall not return to the home, nor have any contact with [Child] outside of supervised visitation as established by DCS, pending further order."  *Id.* at 21. It is therefore apparent that the CHINS court ordered that Mother was not to allow Father any contact with Child irrespective of whether any other court had imposed a no-contact order.

an ability to benefit significantly from the services in which they did participate. *See In re J.S.*, 906 N.E.2d 226, 234 (Ind. Ct. App. 2009) (explaining that "simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change, or only result in temporary change"). Indeed, Parents were on several occasions hostile and aggressive toward service providers and they often claimed that they did not need help. Given the seriousness of the parenting issues giving rise to the CHINS finding in this case—Father's physical abuse of Child resulting in a broken femur and Mother's defiance of a court order prohibiting her from allowing Father to have contact with Child—Parents' resistance to services and refusal to acknowledge their need for help is particularly troubling.

[28] In sum, Parents have had ample time within which to demonstrate their ability to provide a safe and stable home for Child, and they have made virtually no progress toward that goal. We therefore conclude that the trial court's finding that there is a reasonable probability that the conditions resulting in Child's removal and continued placement outside the home will not be remedied is supported by sufficient evidence.

[29] Parents also challenge the trial court's conclusion that termination of their rights is in Child's best interests. In determining whether termination of parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the juvenile court must subordinate the interest of the parent to those of the child,

and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride*, 798 N.E.2d at 199. "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

[30] As set forth above, the trial court's finding that the conditions resulting in Child's removal and continued placement outside Parents' care will not be remedied is supported by the evidence. Additionally, both the CASA and the DCS Family Case Manager testified that they believed termination of Parents' rights was in Child's best interests. Accordingly, the trial court's finding to that effect was supported by sufficient evidence.

[31] Finally, Parents challenge the trial court's conclusion that there is a satisfactory plan for Child's care and treatment. To be "satisfactory" for the purposes of the termination statute, a plan "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (quoting *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*. A plan of adoption is satisfactory even if DCS has not identified a specific adoptive family. *Id.* "In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent." *Id.*

[32] In this case, the trial court found that DCS's plan of adoption was satisfactory for the purposes of the adoption statute. In light of the foregoing case law, Parents' argument that the plan of adoption was unsatisfactory because no specific adoptive family had been identified is without merit.[5]

[33] Judgment affirmed.

[34] Bradford, J. and Pyle, J., concur.

---

[5] Parents' reliance on *In re V.A.*, 51 N.E.3d 1140 (Ind. 2016), in support of this argument is misplaced because that case did not address the question of whether there was a satisfactory plan for the care and treatment of the child.